EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: <br><br> Maritza Ramos Mercado | 2007 TSPR 32 <br><br> 170 DPR ____ |

Número del Caso: AD-2004-3(A) y AD-2004-5

Fecha: 27 de febrero de 2007

Oficina de Asuntos Legales de la Oficina de Administración de los Tribunales:

Lcda. Nilsa García Cabrera

Abogados de la Parte Querellada:

Lcdo. Héctor Meléndez Cano
Lcdo. Manuel Moraza Choisne

Materia: Destitución del cargo de Juez Superior

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Maritza Ramos Mercado                    AD-2004-3(A)

                                         AD-2004-5

PER CURIAM

San Juan, Puerto Rico, a 27 de febrero de 2007

A nosotros los jueces nos corresponde juzgar conforme a la prueba y al Derecho los actos de quienes acuden a los tribunales en busca de justicia. A veces olvidamos, sin embargo, que nuestros actos, tanto en nuestras actuaciones judiciales como en nuestra conducta privada, también están sujetos a ser juzgados.

Este caso presenta un drama lamentable que acaparó la atención pública del País por algunos meses y que demuestra cuán importante es que los jueces manejemos nuestras vidas sin pretender obtener ventaja indebida sobre otras personas a costa del prestigio y las facultades que concede el cargo que desempeñamos.

I.

El 19 de febrero de 2004, la entonces Jueza Presidenta de este Tribunal, Lcda. Miriam Naveira Merly, ordenó una investigación administrativa sobre la conducta de la Juez Superior Maritza Ramos Mercado en el manejo de los casos civiles *Departamento de la Familia v. Irina Smith*, NSRF 2003-0966 y *Ex Parte José Rodríguez Quiñones y Maritza Ramos Mercado,* NSRF 2004-0163, ambos relacionados a los derechos sobre la custodia legal y patria potestad del menor A.G., los cuales motivaron otros dos procesos disciplinarios que este Tribunal ya adjudicó.[1]

El 25 de junio del mismo año, la Oficina de Administración de los Tribunales [en adelante, OAT] rindió el informe solicitado.[2] A la luz de su contenido, la entonces Jueza Presidenta Naveira Merly relevó de sus funciones judiciales a la Jueza Ramos Mercado. Semanas después, el 14 de julio de 2004, la OAT presentó un segundo informe de investigación, esta vez, con relación a la conducta de la Jueza Ramos Mercado vinculada a los casos *Ex Parte Madeline González Urbina*, FJV 2003-1156 y *Ex Parte Lizbeth Carrión Sotomayor y Javier A. Sánchez López*, FDI 2002-1543. Este segundo informe[3], así como el

---

[1] Véase, *In re: Vicenty Nazario y Mainardi Peralta*, res. 13 de octubre de 2006, 2006 TSPR 151, e *In re: Vicenty Nazario*, res. el 16 de octubre de 2006, 2006 TSPR 152.

[2] Este informe fue identificado con el número AD-2004-3.

[3] Reglas de Procedimiento para Acciones Disciplinarias y de Separación del Servicio por Razón de Salud de Jueces del

(Continúa . . .)

previamente sometido, fueron referidos a la Comisión de Disciplina Judicial, entidad que a su vez las asignó a la Lcda. Delia Lugo Bougal para que, de conformidad con el Reglamento de dicha Comisión[4], determinara si existía causa probable para iniciar un proceso disciplinario contra la Jueza Ramos Mercado por violación a los Cánones de Ética Judicial.[5]

El 22 de julio, la Lcda. Bougal determinó que, respecto al *primer informe presentado por la OAT* (AD2 2004-3) existía causa probable para creer que Ramos Mercado había violado los Cánones I, III, IV, V, VIII y IX, XI, XV, XVI, XXIII y XXVI de los de Ética Judicial de 1977. También concluyó la Lcda. Bougal que la conducta reseñada en el primer informe de la OAT podría configurar violaciones a varias disposiciones penales y recomendó que se mantuvieran las medidas disciplinarias provisionales que impuso la Juez Presidenta Naveira Merly.

Posteriormente, el 12 de agosto de 2004, la Lcda. Lugo Bougal rindió otro informe, éste relacionado con el segundo informe prestado por la OAT (AD-2004-5). Concluyó

---

Tribunal de Primera Instancia y del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap.XV-A.

[4] A este informe se le asignó el número AD-2004-5.

[5] Los informes también versaban sobre la conducta de las Juezas Berta Mainardi Peralta y Mirinda Vicenty Nazario. Los procesos disciplinarios contra estas dos Juezas culminaron con la exoneración de la primera y la amonestación de la segunda. En vista de la culminación de tales procesos, es innecesario repetir en esta Opinión los hallazgos y controversias relacionadas a dichas Juezas. Véase*, supra*, nota 1.

que existía causa para creer que la Jueza Ramos Mercado había violado los Cánones I, III, IV, V, VIII, XI, XII, XV, XXI, XXIII, XXIV y XVI de los de Ética Judicial y para creer que ésta había violado la Regla 16 del Tribunal de Primera Instancia.[6] De igual modo, recomendó continuar la suspensión de la Jueza Ramos Mercado como medida provisional.

El cuadro procesal descrito dio paso a que la OAT presentara eventualmente la correspondiente querella contra Ramos Mercado respecto a ambas determinaciones de causa y que solicitara la destitución de ésta del cargo de Juez Superior y la imposición de "cualquier otra medida que proceda". Informe de la Comisión de Disciplina Judicial de 27 de septiembre de 2006, en la pág. 4 (en adelante, *Informe de la Comisión*).

**Los cargos imputados en las querellas**

Los cargos imputados en ambas quejas son extensos.[7] No obstante, y con el propósito de facilitar su comprensión, procedemos a resumirlos.

**(A) Primer Informe de la OAT**

En el <u>primer cargo</u> se alega que la Jueza Ramos Mercado no observó su deber de comportarse de acuerdo a

---

[6] Regla 16 de las Reglas de Administración del Tribunal de Primera Instancia, 4 L.P.R.A. II-B R. 16.

[7] Demos señalar que la OAT incurre, con alguna frecuencia, en la práctica de formular cargos disciplinarios de forma excesivamente extensa, en ocasiones de forma repetitiva, lo que en ocasiones dificulta el análisis y comprensión de sus señalamientos.

las más altas normas de integridad e independencia de su ministerio al: (1) auto asignarse el caso *Clemente Cora v. Santana Quiñones*, Civil Núm. FAL 2000-0733, y al asesorar a la parte demandante de dicho caso; (2) al usar para su beneficio información obtenida en el ejercicio de sus funciones judiciales y solicitar de modo reiterado inspeccionar el expediente del caso *Departamento de la Familia* v. *Irina Smith, supra*; y (3) al realizar directamente múltiples gestiones con funcionarios de agencias administrativas para obtener trato preferencial en las gestiones que hacía para obtener la adopción del menor A.G.

En el segundo cargo se le imputó violar el Canon III que impone a los jueces el deber de dar prioridad a los deberes judiciales sobre cualquier otra actividad.

En el tercer cargo se le imputó violar el Canon IV, que le impone el deber de evitar críticas infundadas contra sus compañeros jueces, al suscribir una declaración jurada de recusación contra un compañero juez en el caso *Departamento de la Familia v. Irina Smith, supra,* con información que se alegó afectaba la honra de éste.

En el cuarto cargo se le imputó violar el Canon V al desobedecer obligaciones administrativas, en particular la Regla 16 de las de Administración del Tribunal de Primera Instancia, que regula el traslado de pleitos en los que intervienen como partes empleados o funcionarios de la Rama Judicial, 4 L.P.R.A. Ap. II-B R. 16, y las Cartas

Circulares Número 25 de 30 de junio de 2000 y 32 de 10 de abril de 2001, que disponen que sólo personas con interés legítimo tendrán acceso a los expedientes de adopción, y que cualquier otra persona tendría acceso a ellos sólo mediante orden judicial y por causa justificada.

En el quinto cargo se le imputó a la Jueza Ramos Mercado violar el Canon VIII que impone a los jueces el deber de rechazar encomiendas incompatibles con sus responsabilidades judiciales o que generen notoriedad indeseable. En particular, se adujo que Ramos Mercado violó dicho Canon al dar la impresión de que estaba sacando ventaja indebida en una controversia en la que era parte interesada y que generó notoriedad indeseable al usar "violencia física y verbal contra funcionarios en el uso de sus funciones" *Informe de la Comisión*, en la pág. 9.

En el sexto cargo se le imputó violar el Canon IX, que le impide recomendar abogados a terceros, al instar a los abogados del Departamento de la Familia a que continuaran interviniendo en el caso *Departamento de la Familia v. Irina Smith, supra*, y al insistir a varios abogados en que presentaran en el Tribunal de Primera Instancia la acción civil de privación de custodia del menor A.G.

En el séptimo cargo se adujo que violó sus deberes de actuar imparcialmente en los casos que preside, según lo establece el Canon XI.

En el octavo cargo se planteó que violó el Canon XV, preceptivo de que los jueces no pueden realizar entrevistas privadas de modo *ex parte*.

El cargo noveno expresa que la Jueza Ramos Mercado mantuvo comunicaciones frecuentes con la juez que presidía el caso *Departamento de la Familia v. Irina Smith*, *supra*, en la Región Judicial de Fajardo.

En el décimo cargo se le imputó violar el Canon XXVI, preceptivo el mismo de que los Cánones de Ética Judicial son normas mínimas de conductas que no excluyen otros deberes exigibles.

Los cargos undécimo, duodécimo y décimo tercero le imputan haber actuado impropiamente al alterar la paz de varias personas vinculadas al drama humano que giró en torno al menor A.G.

Los cargos décimo cuarto, décimo quinto y décimo sexto le imputan haber violado el Canon XXVI, al incurrir en el delito de agresión agravada al agredir físicamente a varias personas durante la tarde en que el Departamento de la Familia realizaba la remoción del menor A.G. de la residencia de Ramos Mercado.

En el décimo séptimo cargo se le imputó a Ramos Mercado conducta impropia, constitutiva del delito de privación ilegal de custodia al impedir que varios funcionarios del Departamento de la Familia salieran de la residencia de Ramos Mercado con el menor A.G. durante la remoción de éste del hogar.

En el décimo octavo cargo se le imputó incurrir en el delito de maltrato según codificado en el Art. 75 de la Ley 177 de 1 de agosto de 2003, conocida como "Ley para el Bienestar y la Protección Integral de la Niñez", al impedir desde enero de 2003 hasta febrero de 2004 que el menor A.G. se relacionara con su familia biológica.

En el décimo noveno se le imputó violar la Regla 62.2 de Procedimiento Civil, que establece que los expedientes de custodia y privación de patria potestad serán confidenciales, al tener acceso al contenido del expediente judicial *Departamento de la Familia v. Irina Smith, supra,* sin seguir los procedimientos establecidos para ello.

Por último, en el vigésimo cargo se le imputó a Ramos Mercado violar el Canon XXIII que dispone que los jueces deben evitar toda conducta que dé la impresión de que ejercen o pretenden ejercer influencia indebida en el ánimo de otro compañero juez. Se aduce que al emitir un comunicado de prensa expresando que la habrían permitido comparecer como parte en el proceso judicial *Departamento de la Familia v. Irina Smith, supra*, Ramoso Mercado dio la impresión de que gozaban de privilegios en el litigio.

Posteriormente, la Comisión resolvió archivar los cargos séptimo, octavo y noveno. Más tarde, la OAT desistió del segundo y cuarto cargo, Inciso "A".

**(B) *Segundo informe de la OAT***

En el <u>segundo informe de investigación presentado</u>, la OAT formuló contra la Jueza Ramos Mercado los siguientes cargos, que también resumimos para una mejor comprensión.

En el <u>primer cargo</u>, se le imputó violar el Canon I, que le impone al Juez el deber de actuar de acuerdo a las más altas normas que honren la integridad e independencia del ministerio judicial, al requerir a un compañero juez que le entregara un expediente judicial para notificar una sentencia en el caso *Ex Parte Madeline González Urbina*, FJV 2003-1156.

En el <u>segundo cargo</u>, se le imputó a la Jueza Ramos Mercado violar el Canon III, que le impone el deber de colocar sus deberes judiciales sobre cualquier otra actividad, al intervenir en el caso *Ex Parte Madeline González Urbina, supra*, para favorecer a la parte promovente en dicho caso, quien era la alguacil asignada a su sala.

En el <u>tercer cargo</u> se le imputó violar el Canon IV que le exige mantener las mejores relaciones de comunicación en sus compañeros jueces al solicitar a un compañero juez que actuara de modo específico en el caso antes citado.

En el <u>cuarto cargo</u>, se alega que Ramos Mercado violó el Canon V de los de Ética Judicial al no cumplir las normas administrativas relativas al traslado de los casos

en los que los empleados de las regiones judiciales figuran como parte.

En el quinto cargo, se alegó que violó el Canon VIII, que le impone el deber de rechazar encomiendas incompatibles con su cargo de juez, al no separar sus responsabilidades judiciales de su interés personal de ayudar a su alguacil de sala.

En los cargos sexto al décimo tercero se imputó a la Jueza Ramos Mercado violar varios Cánones de Ética Judicial al no actuar y guardar la apariencia de imparcialidad al dar trato preferencial al trámite del caso *Ex Parte Lizbeth Carrión Sotomayor y Javier A. Sánchez López*, FDI 2002-1543.

La Comisión de Disciplina Judicial descargó su importante encomienda de llevar a cabo las vistas necesarias con el propósito de poder formular las correspondientes determinaciones de hechos y conclusiones de derecho. En ese proceso le garantizó a la Jueza Ramos Mercado los derechos procesales que le asisten según los consignan las Reglas de Disciplina Judicial, 4 L.P.R.A. Ap. XV-B R. 28.[8]

---

[8] No debe olvidarse que los jueces, como todo ciudadano, tienen derecho a que toda alegación de conducta impropia que se les impute se pruebe, conforme a los criterios probatorios aplicables y a que se le salvaguarde su derecho a presentar las defensas que estimen oportunas, sin que presiones externas menoscaben la justicia procesal a la que son acreedores.

En virtud de las determinaciones de hechos, y conclusiones de derecho que formuló, la Comisión de Disciplina Judicial concluyó, por unanimidad, que:

1) Las actuaciones e intervenciones de la Jueza Maritza Ramos Mercado relacionadas con el caso Departamento de la Familia v. Irina Smith, NSRF2003-0966, constituyen una crasa violación a los Cánones de Ética Judicial.

2) Las actuaciones e intervenciones de la Jueza Ramos Mercado en el trámite judicial del caso Ex parte Lizbeth Carrión Sotomayor, FDI-2002-1543, constituyen una crasa violación a los Cánones de Ética Judicial.

3) La conducta de la Jueza Maritza Ramos Mercado relacionada con el caso Ex parte Madeline González Urbina, FJV2003-1156, no constituye una violación a los Cánones de Ética Judicial.

Como consecuencia de dichas conclusiones, la referida Comisión expresó que, por las infracciones éticas que encontró probadas, "... la Comisión recomienda al Honorable Tribunal Supremo, la destitución del cargo de Jueza Superior de la aquí querellada." (Énfasis suplido.)

En el día de hoy, luego de que todas las partes han expresado sus respectivas posiciones, según lo requiere la reglamentación que regula los procesos disciplinarios contra los jueces, procedemos a descargar nuestra responsabilidad.

II

*Los hechos determinados probados:*

(A)  *El caso Departamento de la Familia v. Irina Smith, supra.*

**1. *Los antecedentes de los hechos que motivan la presente querella***

En el año 2002, el Departamento de la Familia removió al menor A.G. del hogar constituido por Irina Smith, de nacionalidad rusa, y James Smith, de nacionalidad americana. El menor A.G. era hijo biológico de la señora Smith. El padre biológico del menor A.G. se encontraba en Lituania.

El Departamento de la Familia consideró que el bienestar y salud del menor estaban en peligro luego de que la señora Smith ocasionara un incendio en su residencia en presencia del niño. Luego de la remoción, el caso fue referido al Tribunal de Primera Instancia, Sala Superior de Carolina, para la correspondiente vista de ratificación de remoción de custodia. El caso fue identificado como *Departamento de la Familia v. Irina Smith*, supra.

La señora Smith fue ingresada en un hospital psiquiátrico. La custodia del niño A.G., por otro lado, fue concedida al Departamento de la Familia, entidad que luego de ubicarlo en un hogar de crianza de emergencia, lo reubicó en el hogar de crianza de la señora Emma A. Clemente Cora en donde permaneció hasta mayo del 2003.

La supervisión y manejo de los asuntos del menor pasó a la jurisdicción de la Administración de Familias y Niños (ADFAN), agencia adscrita al Departamento de la Familia, específicamente a la Oficina Local II de Carolina, integrada por la División de Trabajo Social, en la que

laboraba, entre otras, la Sra. Miriam González Isaac a quien se asignó el caso, y por la División Legal en la cual laboraban las licenciadas Sonny M. Arroyo Pedró y Marta I. Ojeda Rodríguez.

La estadía del menor A.G. en el hogar de Clemente Cora se prolongó más de lo previsto. De igual modo, las vistas de ratificación de la remoción de la custodia del menor fueron pospuestas en varias ocasiones debido a que la señora Smith estaba recluida en una institución hospitalaria. Mientras tanto, las señoras Anastasia P. Kitsul, posteriormente designada como Cónsul de Rusia en Puerto Rico, y la Sra. Elena Portuondo, ambas miembros de la comunidad rusa en Puerto Rico, realizaban gestiones para comunicarse con los abuelos maternos del menor quienes permanecían en Lituania.

Luego de la reclusión hospitalaria de la señora Smith, el Departamento de la Familia estableció un plan de servicios y de visitas para que ésta pudiera relacionarse con el menor A.G. Las visitas se programaron semanalmente en la Oficina Local II de Carolina. Durante ese período, los abuelos del menor expresaron su disponibilidad para recibir al menor. El Departamento, sin embargo, alegó no contar con información pormenorizada sobre la situación de éstos de modo que pudiera asumir una posición final al respecto. Por tal razón, el asunto fue referido a la División Legal de la Oficina Local II de Carolina.

Eventualmente, el Tribunal de Primera Instancia determinó que la remoción del menor se realizó de conformidad con los procesos establecidos para ello y el Departamento de la Familia recomendó el regreso del menor al hogar biológico. A esa fecha, la madre del menor se encontraba en proceso de divorciarse y había comenzado a superar sus problemas depresivos.

Semanas después, en ocasión de una visita que realizó al menor, la señora Smith expresó su deseo de regresar a su país y dejar al menor A.G. en Puerto Rico. Funcionarios del Departamento de la Familia le explicaron las consecuencias de ese proceder. Le informaron, entre otras cosas, que de irse de Puerto Rico, el Departamento de la Familia podría solicitar la privación de la patria potestad.

La señora Smith optó por abandonar el País. Ante esta determinación, el Tribunal de Primera Instancia concedió al Departamento de la Familia la custodia legal y permanente del niño y ordenó el archivo del caso, tras lo cual el expediente de éste fue referido al área de archivo inactivo del Centro Judicial de Carolina. En ese momento, el niño A.G. continuaba residiendo en el hogar de la señora Clemente Cora.

### 2. *Las etapas posteriores al archivo del caso de privación de custodia*

Conforme lo determinó probado la Comisión de Disciplina Judicial, "las intervenciones de la División

Legal de la Oficina Local II de Carolina, con posterioridad al cierre de [un] caso, se dan cuando se solicita alguna consulta legal sobre éste o se entrega la custodia del menor a un familiar o cuando se determina solicitar la privación de la patria potestad". *Informe de la Comisión*, en la pág. 34. Añade el informe que "tampoco es uso y costumbre que la División Legal de la Oficina Local II de Carolina intervenga de forma directa una vez el niño está ubicado en el hogar de crianza, ni tiene bajo su responsabilidad coordinar visitas del menor". *Id*. Conforme al estado procesal del caso, competía a la Oficina Local dar seguimiento al plan de servicios que se estableció para el menor. En ese momento, se había logrado comunicación con los abuelos maternos del menor, quienes expresaron su deseo de llevarlo a su hogar en Lituania.

La primera intervención de la Jueza Ramos Mercado con el caso fue a finales del 2002, cuando se comunicó con la Supervisora de la Oficina Local de Carolina para expresar su interés en conocer y ayudar al menor A.G. El interés de la Juez fue comunicado por la Supervisora de dicha oficina, Sra. Doris Arroyo Vélez, a la Trabajadora Social González Isaac, quien, como antes se expresó, estaba asignada al caso. Le informó que "era conveniente que el niño se relacionara con la Jueza Ramos Mercado porque los funcionarios de la Oficina Local II de Carolina postulaban en el Tribunal de Carolina", y que "ello podría ayudar a mejorar la relación entre la oficina y el tribunal ya que

en varias ocasiones había sido citada para comparecer al tribunal por el incumplimiento de los funcionarios de la División de Trabajo Social con los requerimientos de los jueces". *Id.* en la pág. 37. Contrario a esta recomendación, González Isaac consideró que tal posibilidad no era conveniente.

Eventualmente la Jueza Ramos Mercado solicitó que le llevaran al niño a una actividad en el Centro Judicial de Carolina. La visita del niño no se concretó en esa ocasión. Sin embargo, el interés de Ramos Mercado en conocer al menor no menguó, por el contrario, insistió en relacionarse con él.

En diciembre del 2002, la supervisora de la División de Trabajo Social en Carolina autorizó que el niño comenzara a relacionarse con Ramos Mercado. La autorización conferida incluía que ésta visitara al menor en el hogar de crianza en el que se encontraba y que el menor pernoctara en la casa de la Jueza Ramos Mercado --lo que ocurrió durante los fines de semana a partir de diciembre de 2002-- aun cuando el hogar de ésta no estaba certificado como hogar de crianza.

Luego de la Navidad de ese año, el menor A.G. permaneció el resto de sus vacaciones en el hogar de la Jueza Ramos Mercado. A esa fecha, el Departamento de la Familia no había realizado indagación alguna sobre la idoneidad del hogar de la Juez para ser certificado como hogar de crianza. Posteriormente, ante la expiración de la

visa del menor, la Jueza Ramos Mercado se comunicó con la entonces Secretaria del Departamento de la Familia para conocer si dicha agencia había presentado los documentos requeridos ante la Oficina de Inmigración y Naturalización de Estados Unidos.

Simultáneamente con estos acontecimientos, la señora Smith realizaba desde Lituania gestiones para lograr el traslado del menor a su país de origen. Al respecto, el 14 de enero de 2003, la Trabajadora Social González Isaac recibió una carta de la señora Smith en la que ésta indicaba que había solicitado a la Embajada de Estados Unidos la deportación de su hijo. Ese mismo día, la Jueza Ramos Mercado solicitó a la Secretaría del Tribunal el expediente del caso, con el objetivo de examinarlo.

A principios de ese mismo año, la señora Clemente Cora, encargada del hogar de crianza al cual estaba asignado el menor A.G., comunicó a la Jueza Ramos Mercado que era la parte promovente en un caso de pensión alimenticia contra su ex esposo, que a esa fecha se encontraba cerrado, pero que interesaba reabrir. Ramos Mercado le comunicó que podría reabrirse mediante la presentación de una moción.

En una ocasión en que la Jueza Ramos Mercado fue a buscar al menor a la residencia de Clemente Cora, aquella le indicó que necesitaba una fotografía del esposo de ésta para localizarlo más fácilmente y "que ella misma iba a atender su caso". *Id.* en la pág. 43. Indica el Informe de

la Comisión que "[e]n ese momento la señora Clemente Cora supuso que la Jueza Ramos Mercado decidió atender su caso en consideración a que era quien cuidaba al niño". *Id*.

Mientras tanto, las autoridades rusas en Puerto Rico hacían gestiones con las oficinas federales de naturalización e inmigración para lograr la entrega del menor a los abuelos en Lituania. La Jueza Ramos Mercado, por su parte, realizaba gestiones para lograr que funcionarios de Puerto Rico intervinieran en el caso en la oficina de inmigración para lograr que el menor obtuviera su visa. De hecho, una de esas gestiones la realizó a finales del mes de febrero directamente con la entonces Secretaria del Departamento de la Familia, Yolanda Zayas Santana, cuando solicitó a ésta que intercediera ante el Comisionado Residente de Puerto Rico en Washington, D.C., para que ayudara a acelerar dicho proceso.

Conforme los hechos, determinados probados por la Comisión de Disciplina Judicial, la Jueza Ramos Mercado incluso solicitó sin éxito a la Secretaria del Departamento de la Familia el número de teléfono o celular del Comisionado Residente para comunicarse directamente con él. Expresa el informe que Zayas Santana declaró que "se sintió incómoda por las preguntas que le hacía la Jueza Ramos Mercado ya que entendía que eran inapropiadas". *Id*. en las págs. 44-45. Posteriormente, Ramos Mercado realizó con el mismo propósito otras

llamadas al Departamento de la Familia, específicamente a la Secretaria y Subsecretarias del Departamento.

El Informe de la Comisión detalla, además, varias gestiones realizadas por Ramos Mercado relacionadas al estatus migratorio del menor, en particular con la Procuradora de Menores encargada del caso, Lcda. Gloemy Vega Torres, de quien solicitó en múltiples ocasiones que asistiera a las reuniones que se realizaban tanto en el Departamento de la Familia como en las Oficinas de Inmigración y Naturalización Federal y en las que se discutiría el caso del menor. También citó a la Lcda. Vega Torres en al menos dos ocasiones a su oficina en el Centro Judicial de Carolina para dialogar sobre la situación del menor. De igual modo, realizó durante varios meses múltiples llamadas telefónicas a abogados del Departamento de la Familia.

Durante ese mismo mes, específicamente el 24 de febrero de 2003, la señora Clemente Cora presentó en el Tribunal de Carolina una moción por derecho propio con el fin de que el caso de alimentos en el que figuraba como promovente fuese reactivado. Al día siguiente, la Jueza Ramos Mercado, reasignó el caso a su salón de sesiones y fijó una vista de desacato para el mes de marzo. Ante la incomparecencia del esposo de la señora Clemente Cora en esa ocasión, la Jueza Ramos Mercado fijó una vista de seguimiento para el mes de mayo siguiente.

En abril, la señora Clemente Cora acudió al Departamento de la Familia para solicitar que el menor A.G. fuese ubicado permanentemente en el hogar de la Jueza Ramos Mercado. Adujo que estaba molesta con las exigencias de ésta respecto al cuidado del menor y con el hecho de que con frecuencia la Juez incumplía con el horario de entrega del niño. Añade el informe que "la señora Clemente Cora se sentía frustrada y con coraje porque su caso personal de pensión alimentaria estaba asignado al salón de sesiones de la Juez Ramos Mercado". *Id.*, en la pág. 47.

El informe detalla algunas desavenencias adicionales entre Clemente Cora y Ramos Mercado referentes al cuidado del menor, así como respecto a las actividades en las que éste participaría, como lo fue una actividad del día de logros escolar en mayo del 2003, a la que el menor no asistió, y un campamento de verano en el que la Jueza Ramos Mercado inscribió al menor durante el verano de ese año. De igual modo, el informe detalla las gestiones que la Jueza Ramos Mercado hizo para obtener del Departamento de la Familia autorización para que el menor la acompañara a Estados Unidos sin que previamente su hogar fuera certificado como hogar de crianza, según lo requería la reglamentación vigente al respecto.

Eventualmente, en mayo del 2003 inició el proceso de evaluación del hogar de Ramos Mercado para ser certificado como hogar de crianza. Aun sin que finalizara el procedimiento correspondiente, el menor A.G. fue ubicado

físicamente en la residencia de Ramos Mercado, aunque administrativamente estaba asignado al hogar de la señora Clemente Cora. La vestimenta y documentos escolares del menor fueron entregados a la Jueza Ramos Mercado.

Luego de ubicar el menor en la residencia de la querellada, el caso de la señora Clemente Cora fue referido al salón de sesiones de la Juez Mirinda Vicenty Nazario, sin que Clemente Cora fuera notificada previamente del cambio, por lo que se enteró el día de la vista del caso. Ese mismo día la Juez Vicenty Nazario encontró incurso en desacato al esposo de Clemente Cora y ordenó su arresto. Aun cuando la intervención de Vicenty Nazario ocurrió en mayo del 2003, no fue hasta un mes más tarde que la Juez Vicenty Nazario reasignó el caso de la señora Clemente Cora oficialmente a su salón de sesiones.

Posteriormente, Vicenty Nazario trasladó el caso a la Región Judicial de Fajardo. Allí fue referido a una Sala de Relaciones de Familia en la cual eventualmente se decretó el archivo del caso para fines estadísticos.

La Jueza Ramos Mercado, ahora como custodio del menor, inició conversaciones para lograr la adopción de éste, lo que implicaba iniciar el proceso de privación de la patria potestad de los padres biológicos. La federación rusa, por su parte, realizaba gestiones para intervenir en

los procesos judiciales que se desarrollaban toda vez que entendían que aplicaban convenciones internacionales.[9]

A finales del mes de agosto, el Departamento de la Familia certificó el hogar de Ramos Mercado como hogar de crianza, con efectividad retroactiva al 28 de mayo del 2003. El informe de la Comisión de Disciplina Judicial revela que durante esos días, la Jueza Ramos Mercado solicitó que los procesos se aceleraran. Surge del informe que tal reclamo fue más insistente cuando la abuela del menor pudo visitar el País tras obtener una visa. De hecho, el informe de la Comisión destaca que durante esos días, "la situación en la que se encontraba era una delicada porque [la Lcda. Ojeda Rodríguez] postulaba en el Tribunal de Carolina donde la Jueza Ramos Mercado era la Juez Administradora. La Jueza Ramos Mercado se comunicaba con la Lcda. Ojeda Rodríguez tanto al teléfono de su oficina como a su celular". *Id.*, en la pág. 60.

De igual modo, Ramos Mercado solicitó autorización al Departamento de la Familia para llevar al menor a *Disney World*, en el Estado de Florida, del 21 al 7 de diciembre de 2003, fecha que coincidía con la visita de la abuela del menor al País, razón por la cual, la madre biológica

---

[9] Durante ese período, la madre biológica del menor envió varias comunicaciones por facsímil a la Trabajadora Social a cuyo cargo se encontraba el caso del menor A.G. En las primeras comunicaciones la madre expresó el interés de recuperar al menor. Sin embargo, posteriormente expresó su deseo de que el menor fuera adoptado en Puerto Rico, ya que consideraba que no estaba en condiciones de hacerse cargo de él.

de éste envió una carta el 19 de noviembre en la que "solicitó que su madre […] pudiera reunirse con el […] menor y que el viaje del niño fuese cambiado para una fecha posterior porque el tiempo que su madre permanecería en Puerto Rico era limitado". *Id.* en la pág. 61. También expresó su deseo de que su hijo regresara a Lituania.

El 20 de noviembre, funcionarios del Departamento de la Familia concedieron el permiso de viaje solicitado. Consigna el Informe de la Comisión que "[t]odos los trámites de la autorización de[l] viaje se realizaron de prisa". *Id*. Ese mismo día, la abuela del menor presentó un recurso en el Tribunal de Primera Instancia, Sala Superior de San Juan, en la que solicitó que se impidiera que el menor saliera del País.

La petición fue declarada no ha lugar. Entonces, la abuela del menor, señora Irina Nikolaievna Romanova, decidió comunicarse directamente con el hogar de crianza del menor para solicitar que se pospusiera el viaje. Como ésta no hablaba español o inglés, la ahora cónsul rusa, Sra. Anastasia Kitsul, decidió realizar la llamada. Sin embargo, el número telefónico marcado resultó ser el de la madre de la Jueza Ramos Mercado, quien se molestó al advertir el propósito de la comunicación. Ese mismo día, ocurrió un incidente entre la cónsul Kitsul y una persona que telefónicamente se identificó como la "señora Ramos" que narramos según fue consignado por la Comisión de Disciplina Judicial:

De camino a Isla Verde, [la cónsul] recibió una llamada a su celular a las 8:46 de la noche de una persona que se identificó como la "señora Ramos" y quien le hablaba en un tono de voz alto y enérgico. La Juez Ramos Mercado manifestó a la cónsul Kitsul que ésta no tenía que llamar a casa de su mamá, que ella no podía comunicarse directamente con el hogar de crianza debido a la confidencialidad de los procesos ni la Juez Ramos Mercado podía coordinar una visita de la abuela sin mediar la intervención del Departamento de la Familia, que ella no se oponía a que el menor se reuniera con su abuela una vez regresaran del viaje y por tal razón sólo estarían en Disney por una semana, en vez de dos, como fue originalmente planificado, que el niño vería a la abuela cuando ella lo decidiera, que tenía que aprender a respetar, amenazó con desaforar al licenciado López Rodríguez, representante legal de la federación rusa en Puerto Rico y [expresó] que ella tenía conexiones. *Id.*, en las págs. 62-63.

Por el contenido de la conversación la Cónsul Kitsul entendió que se trataba de la Jueza Ramos Mercado. Por otro lado, la reunión entre el menor A.G. y su abuela no se efectuó antes del viaje.

Estando el caso pendiente en la Región Judicial de Fajardo, la Jueza Ramos Mercado solicitó a la Lcda. Ojeda Rodríguez, abogada de la oficina de Carolina del Departamento de la Familia, que continuara interviniendo en el caso, aun cuando la costumbre era que los abogados que intervinieran en los casos del Departamento de la Familia fueran los asignados a la región judicial en la que se ventila el caso en cuestión.

Durante la estadía del menor con la Jueza Ramos Mercado se coordinó una reunión entre el menor y la abuela. La propia Ramos Mercado intervino en la coordinación de la reunión y expresamente solicitó que ni

la Cónsul Kitsul ni el licenciado López Rodríguez estuvieran presentes. La reunión se efectuó el 9 de diciembre de 2003 y en ella intervino como intérprete el señor Alexander Savvinov. Las declaraciones vertidas revelan que en un momento la reunión se tornó tensa. La Jueza Ramos Mercado expresó que el menor se encontraba bien con ella y que la señora Romanova podría visitarlo cuando quisiera. Savvinov intervino en la conversación e indicó que el interés de la abuela era que el niño regresara con ella a Lituania. Indica el Informe de la Comisión que "en ese momento, la Lcda. López Prieto, abogada de la Juez Ramos Mercado, utilizó un tono de voz fuerte y enérgico, se tornó agresiva y amenazó con ponerle fin a la reunión si el señor Savvinov continuaba interviniendo [en] los asuntos que se discutían y, de ser así, la señora Romanova no tendría la oportunidad de ver al menor". *Informe de la Comisión*, en la pág. 69. Al finalizar la reunión, el señor Savvinov se disculpó. Declaró, además, que la Jueza Ramos Mercado le expresó mientras le tocaba el hombro "*stay out of trouble*" o "*keep out of trouble*". *Id.* en la pág. 70.

El 19 de diciembre de 2003, la señora Romanova presentó una petición de intervención en el caso. Simultáneamente con estos acontecimientos, el Departamento de la Familia inició una investigación en torno al trámite que siguió el caso en dicha agencia.

Posteriormente, la Trabajadora Social González Isaac entrevistó al menor en la residencia de Ramos Mercado. Por vez primera el niño dio expresiones que sugerían la posibilidad de que anteriormente hubiese sido víctima de maltrato físico y emocional de parte de familiares, incluyendo posible abuso sexual por parte de su abuelo. La Jueza Ramos Mercado comunicó esta información a la Secretaria del Departamento de la Familia al coincidir en una actividad profesional. Una evaluación psicológica reveló que el niño estaba deprimido y ansioso.

Más tarde, alegando ser padres de crianza del menor A.G., la Jueza Ramos Mercado, en unión a su esposo señor José Rodríguez Quiñones, presentó una petición de intervención en el proceso que se desarrollaba en Fajardo. La Juez Berta Mainardi Peralta, luego de autorizar la intervención de éstos y de la señora Romanova, requirió a las partes abstenerse de hacer expresiones públicas relacionadas con el caso, bajo apercibimiento de severas sanciones. El 3 de febrero, el Departamento de la Familia presentó en instancia un aviso de desistimiento en relación con la petición de privación de patria potestad. Ese mismo día, aún vigente la orden de confidencialidad, la representación legal de Ramos Mercado envió un comunicado de prensa con la anuencia de ésta a dos estaciones de televisión puertorriqueñas.[10]

---

[10] En el comunicado de prensa se expresó:

(Continúa . . .)

Posteriormente, hubo varios altercados entre Ramos Mercado y la Trabajadora Social González Isaac. En una ocasión, luego de la visita familiar del menor con su abuela, la Juez llamó a González Isaac a su teléfono celular y le indicó gritando que el menor estaba afectado y que le explicara qué había ocurrido. Indica el Informe de la Comisión que,

---

Se ha manifestado en múltiples instancias a través de los medios noticiosos del País toda una serie de versiones falsas e incorrectas en relación con la situación que vive el que espero sea mi hijo en un futuro cercano.

En dichas expresiones, se ha dicho que soy una juez poderosa, implicando que quiero hacerle daño al niño, a través de mi posición y mis relaciones.

De entrada, expreso que mi único poder es la Ley del Amor. Eso se podrá corroborar en su día, a través de los procedimientos judiciales pertinentes. Estos incluirán las opiniones periciales de los especialistas en la materia que ya han intervenido e intervendrán para el bienestar del niño.

Además, el niño que es el que verdaderamente siente, padece y vive intensamente el drama de su vida, sabrá expresar en su día cual [sic] es su verdad.
Al presente, sólo puedo manifestar que estoy impedida de acudir a los medios, para exponer mi versión detallada de todo lo acontecido y acontece, porque ello exacerbaría aún más la controversia creada por aquellos que así lo han hecho.

Estoy muy conciente de cuanto daño emocional puede sufrir y sufre este niño, en medio de un conflicto que se pretende litigar en los medios noticiosos, en vez de [en] los foros apropiados. Por ello existe la ley que protege la estricta confidencialidad de estos casos. Además, fue en función del mejor bienestar del niño que la honorable Juez Mainardi dictó una orden prohibiendo la comunicación pública en este asunto orden que considero no ha sido cumplida por aquellos que han utilizado los medios casi diariamente, en contra del me[j]or bienestar del nene". *Informe de la Comisión*, en la pág. 77.

> [a]nte dicha situación la Trabajadora Social
> González Isaac le solicitó que por cuestión de
> respeto bajara el tono de voz  le dijo que el
> menor no estaba diciendo la verdad. A renglón
> seguido, la Juez Ramos Mercado comenzó a gritar
> más fuerte, manifestó que su hijo no era un
> mentiroso y utilizó palabras soeces hacia la
> Trabajadora Social y hacia el Departamento de la
> Familia. Tras el incidente la Trabajadora Social
> González solicitó a la Directora Regional Muñoz
> Marzán que reasignara el caso a otra trabajadora
> social porque había tenido varias discusiones con
> la Juez Ramos Mercado, e inclusive ésta le había
> faltado el respeto. *Id.*, en la pág. 78.

Luego de varios incidentes procesales, en particular, una petición de inhibición contra el juez que presidía el proceso, y que discutiremos más adelante, el 6 de febrero de 2004, el Departamento de la Familia decidió remover al menor A.G. del hogar de la Jueza Ramos Mercado. Se planificó realizar la remoción luego de una reunión entre el menor y su abuela. En esa ocasión, luego de la visita, el niño fue llevado a la casa de la Jueza Ramos Mercado por varios funcionarios del Departamento de la Familia para que se despidiera y recogiera sus pertenencias.

Al llegar, los funcionarios expresaron a Ramos Mercado que debía entregar las pertenencias del menor ya que sería removido del hogar. Ramos Mercado los invitó a entrar a la casa y permitió que el vehículo del Departamento de la Familia se estacionara en la marquesina de la residencia, ya que llovía. El niño estaba supuesto a permanecer dentro del vehículo.

Tras cuestionar la determinación, la Jueza Ramos Mercado expresó su deseo de que su esposo, quien no se

encontraba en el hogar, tuviera oportunidad de despedirse del menor. La Directora Regional del Departamento de la Familia lo autorizó, por lo que Ramos Mercado se comunicó con él y le informó lo que ocurría.

Ramos Mercado deseaba que el propio niño recogiera sus pertenencias. Sin embargo, se le explicó que no podía verlo en ese momento, pues las trabajadoras sociales le estaban explicando lo que ocurría. En un momento, Ramos Mercado salió de la residencia y nuevamente pidió dialogar con el menor. Se le reiteró que no podría, por lo que Ramos Mercado comenzó a llorar. Ante dicho cuadro se le permitió verlo.

Los funcionarios del Departamento de la Familia permitieron que el niño saliera del vehículo. Se expresa en el informe de la Comisión lo siguiente:

> Una vez el menor A.G. sale del vehículo abrazó a la Juez Ramos Mercado y ésta lo besó y le dijo que estuviera tranquilo. Cuando la Juez Ramos Mercado se dirigió a entrar a la casa con el niño las personas presentes en ese momento la rodearon para no permitirle la entrada a su casa. En ese momento, la señora Aponte Urbina le indicó a la Juez Ramos Mercado que no podía llevar al niño al interior de la residencia. A renglón seguido, la Juez Ramos Mercado le dio instrucciones al niño para que entrara a la residencia y se encerrara en su cuarto. Cuando el niño corrió hacia el interior de la residencia la Juez Ramos Mercado caminó tras él e intentó cerrar la puerta. Mientras tanto, la Juez Ramos Mercado manifestaba que no permitiría que se llevaran al menor A.G. sin una orden judicial. Para impedir que la Juez Ramos Mercado cerrara la puerta de la casa de tal modo que los funcionarios del Departamento de la Familia quedaran fuera de la casa, la Directora Regional Muñoz Marzán se colocó en medio de la puerta de entrada de la residencia. En ese momento la Juez Ramos Mercado intentó cerrar sin éxito la puerta.

No obstante, la señora Aponte Urbina logró tener acceso a la residencia. Debido a la forma en que se desarrollaban los acontecimientos la Directora Regional Muñoz Marzán le dijo a la Juez Ramos Mercado que se calmara para llevar a cabo el proceso de forma tranquila, pero ésta exigía que todos los funcionarios del Departamento de la Familia salieran de su residencia. La señora Aponte Urbina, quien había logrado entrar a la residencia, le indicó de forma enérgica a la Juez Ramos Mercado que las instrucciones eran que el niño tenía que ser removido del hogar. Sin embargo, la Juez Ramos Mercado manifestaba que no lo iba a entregar. *Id*. en la pág. 84.

Posteriormente, llegaron al lugar el esposo de Ramos Mercado, sus representantes legales y otras personas, algunas familiares de ésta. Funcionarios de la Policía de Puerto Rico también acudieron a la residencia a petición del esposo de Ramos Mercado. Ésta, aun cuando estaba afectada emocionalmente por la situación, solicitó a los funcionarios del Departamento de la Familia que abandonaran la residencia, lo que eventualmente hicieron.

Luego, presentaron una denuncia contra la Jueza Ramos Mercado por alegada privación ilegal de custodia. La denuncia fue archivada luego de que, tras un acuerdo, ese mismo día el niño A.G. fue entregado al Departamento de la Familia. Posteriormente, el menor fue devuelto a su país natal junto a su familia biológica.

**(B)   *Los hechos relacionados con el caso Ex parte Lizbeth Carrión Sotomayor, FDI2002-1543***

En la querella radicada se plantea, además, que la Jueza Ramos Mercado actuó con parcialidad e impropiamente en el manejo del caso *Ex parte Lizbeth Carrión Sotomayor,*

*supra,* ya que Ramos Mercado contrató como su representante legal a la Lcda. López Prieto, quien comparecía como abogada de una de las partes de dicho caso ante la propia Jueza Ramos Mercado.

En esencia, los hechos se remontan a un proceso de divorcio por consentimiento mutuo tramitado en la Sala de la Jueza Ramos Mercado en la Región Judicial de Carolina, en el que se acordó que la señora Lizbeth Carrión Sotomayor, una de las partes del proceso de divorcio representada por la Lcda. Evelyn Benvenutti, realizaría un estudio económico para evaluar si le correspondía algún crédito por concepto de la plusvalía de ciertas acciones privativas del señor Javier A. Sánchez López. Acordaron que la evaluación se realizaría en un plazo improrrogable de 60 días contados a partir del 4 de octubre de 2002. Sánchez López se comprometió a proveer todos los documentos necesarios para la evaluación.

El 4 de diciembre de 2002, Carrión Sotomayor por medio de su representación legal, solicitó al Tribunal la entrega de los documentos referidos. Días después, el 20 de diciembre, la representación legal de Sánchez López presentó una moción para que el Tribunal tomara algunas determinaciones sobre una hija de la pareja de ex esposos. Ante tal petición, el 27 de diciembre de 2002 Ramos Mercado se comunicó telefónicamente con la Lcda. Benvenutti para ver la disponibilidad de ésta para realizar una vista ese mismo día. La vista no pudo

realizarse en esa ocasión y se fijó para el 17 de febrero de 2003. El 2 de enero de 2003, la Lcda. Benvenutti reiteró su solicitud de documentos. El 22 de enero Ramos Mercado dispuso que consideraría el asunto en la vista que pautó para el 17 de febrero de 2003.

El 14 de enero, la Lcda. López Prieto presentó dos nuevas mociones, que fueron atendidas por Ramos Mercado mediante una orden que emitió el 4 de febrero, en la que notificó que las consideraría en la vista previamente citada. Ramos Mercado tomó igual determinación respecto a otras mociones presentadas por la Lcda. Benvenutti. La vista del 17 de febrero, sin embargo, fue pospuesta para el 27 del mismo mes, debido a que el 17 fue día feriado.

El día de la vista, Ramos Mercado concedió 90 días a López Prieto para que expusiera su posición en torno al informe económico. Tras concluir el plazo, y sin que mediara una solicitud de prórroga escrita, el 23 de junio de 2003 Ramos Mercado emitió una orden en la que concedió una plazo adicional de 20 días.

El 2 de julio de 2003 la Lcda. Benvenutti reiteró su solicitud original en cuanto a los documentos requeridos. Ante esta nueva solicitud, el 3 de julio Ramos Mercado le remitió copia de la orden emitida el 23 de junio pasado en la que había concedido un plazo adicional a la Lcda. López Prieto.

El 6 de agosto de 2003, López Prieto solicitó con éxito 15 días adicionales. Ante nuevos incumplimientos, la

Lcda. Benvenutti presentó el 19 de septiembre de 2003 una nueva moción para advertir sobre el incumplimiento y para que concediera como remedio el pago del crédito reclamado por su representada. Ramos Mercado concedió a López Prieto un término adicional de 15 días para replicar.

El 6 de octubre de 2003, la Lcda. Benvenutti informó a la Jueza Ramos Mercado que el perito del señor Sánchez López había rendido su informe y había concluido que su representada no tenía derecho a la plusvalía en controversia y solicitó una vista para que se discutiera dicho asunto. Ramos Mercado emitió una orden el 30 de octubre en la que ordenó a López Prieto replicar en un término de 15 días. El 23 de octubre de 2003 López Prieto presentó una moción en la que informó las conclusiones del perito, según previamente fueron informadas por la Lcda. Benvenutti, y solicitó que se diera por cumplida la orden de 27 de febrero de 2003.

Ante este cuadro de hechos, el 24 de noviembre de 2003 la Lcda. Benvenutti presentó una nueva moción en la que solicitó una vista para discutir la controversia trabada. Ramos Mercado, sin embargo, emitió una orden el 2 de diciembre de 2003 en la que declaró Ha Lugar la moción presentada por López Prieto el 23 de octubre de 2003. No obstante, hubo confusión entre las partes en torno a si lo resuelto por Ramos Mercado implicaba que daba por cumplida la orden de febrero de 2003 o si declaraba Ha Lugar el contenido del informe del perito.

El 30 de noviembre de 2003, la Lcda. López Prieto presentó una moción para notificar sus vacaciones y el 11 de diciembre de 2003, Ramos Mercado se dio por enterada. Este mismo día también remitió a la Lcda. Benvenutti la orden previamente emitida el 2 de diciembre y mediante orden interna refirió el caso a la Juez Mirinda Vicenty Nazario, Juez Coordinadora de Relaciones de Familia.

Por otro lado, conforme a la prueba que la Comisión de Disciplina Judicial tuvo ante sí, a la fecha del 8 de diciembre de 2003, la Jueza Ramos Mercado y su esposo, habían formalizado un contrato de servicios profesionales con la Lcda. López Prieto, retroactivo el mismo al 21 de noviembre de 2003, para que la representara en el caso del menor A.G. sobre privación de patria potestad y custodia.

La prueba reveló que en esa misma fecha, 21 de noviembre de 2003, la Lcda. López Prieto había participado en una reunión con funcionarios del Departamento de Estado en representación de Ramos Mercado. Surge del Informe de la Comisión que "[e]n dicha reunión la Lcda. López Prieto advirtió al Lcdo. José A. López Rodríguez y a la Cónsul Honorario Anastasia Kitsul que de no desistir de la alegada persecución en contra de la familia de la Juez Ramos Mercado los demandaría por acecho y que ambos se expondrían a que presentaran querellas en su contra". *Id.* en la pág. 92.

Más aún, la Lcda. Ojeda Rodríguez, empleada del Departamento de la Familia, expresó que días antes de esta

reunión, la Lcda. López Prieto se había comunicado con ella y se había identificado como la representante legal del hogar de crianza. *Id.*

En febrero de 2004, por voz de su cliente, la Lcda. Benvenutti advino en conocimiento de que López Prieto representaba a la Jueza Ramos Mercado, lo que motivó una petición de recusación contra ésta. Eventualmente, la Lcda. Benvenutti presentó en la OAT una queja juramentada.

La prueba reveló que del 1997 al 2003, la Lcda. López Prieto intervino como abogada en otros casos que se ventilaban en la sala de la Jueza Ramos Mercado.

### *(C) Los hechos relacionados con el caso Ex parte Madeline González Urbina, FJV2003-1156*

Madeline González Urbina era la alguacil asignada al salón de sesiones de la Jueza Ramos Mercado. Por razón de una incongruencia entre el nombre que de ésta constaba inscrito en el Registro Demográfico y el que constaba en ciertos documentos presentados la Universidad en la que estudiaba, corría el riesgo de perder ayudas económicas para sus estudios. Por tal razón, instó en el Centro Judicial de Carolina el recurso *Ex parte Madeline González Urbina, supra*, sobre rectificación de nombre en el Registro Demográfico. El caso fue asignado al salón de sesiones del Juez Rafael Vissepó Vázquez.

La peticionaria González Urbina comunicó su situación a la Juez Vicenty Nazario, quien, aun cuando el caso estaba asignado a otro salón de sesiones, solicitó el

expediente del caso y emitió sentencia concediendo el remedio solicitado.[11]

Posterior a la notificación de la referida sentencia, un error en el epígrafe del caso motivó que el expediente fuese referido a la oficina del Juez Vissepó Vázquez, quien al percatarse de que un caso asignado a su sala había sido resuelto por otro juez sin que previamente le fuera comunicado, llamó a la Juez Vicenty Nazario para increparle por la situación. Eventualmente, la Jueza Ramos Mercado llamó a la oficina de Vissepó para que le enviaran el expediente. A preguntas de éste, Ramos Mercado le explicó las razones que motivaron la solicitud de corrección de nombre. Sin embargo, ante la insistencia del Juez Vissepó Vázquez en obtener explicaciones, indica el informe que "la Juez Ramos Mercado le contestó de forma airada que no se pusiera con eso. Posteriormente, la Juez Ramos Mercado terminó abruptamente la conversación". *Id.* en la pág. 98.


III

### *El marco deontológico aplicable*

En el pasado hemos advertido que los jueces deben comportarse éticamente tanto en el ejercicio de las prerrogativas de sus cargos como en su vida privada. *In re: González Acevedo y Pagán Pagán,* res. 20 de junio de

---

[11] La responsabilidad disciplinaria de la Juez Vicenty Nazario por estos incidentes ya fue adjudicada por este Tribunal.

2005, 2005 TSPR 87; *In re: Francisco Ortiz Rivera*, res. 21 de diciembre de 2004, 2004 TSPR 209.

Ese deber parte del principio de que la legitimidad de las instituciones de justicia se funda no sólo en la autoridad jurídica que se les ha dado mediante los mecanismos formales del estado, sino también en la confianza que la ciudadanía tiene en las personas que ejercen cargos públicos. A tenor con esta visión, "el juez no sólo debe preocuparse por "ser" [íntegro], según la dignidad propia del poder conferido, sino también por "parecer[lo]", de manera de no suscitar legítimas dudas en la sociedad acerca del modo en el que se cumple el servicio judicial". *Exposición de Motivos, Código Modelo Iberoamericano de Ética Judicial*, Cumbre Judicial Iberoamericana (2006). La ética judicial es, pues, una herramienta apropiada que, a partir del propio Derecho, procura la excelencia judicial.

Nuestros Cánones de Ética Judicial siguen esta pauta. Son normas mínimas de conducta, cuya exigibilidad en cada juez es autoimpuesta, pues su aceptación como marco normativo es consustancial a la aceptación del cargo. *In re: González Acevedo y Pagán Pagán, supra.*[12]

---

[12] Al respecto, el Preámbulo de los Cánones de Ética Judicial del 2005 dispone en parte:

Al igual que todo ciudadano o ciudadana, las Juezas y los jueces están obligados a cumplir con la ley, modelando la conducta ciudadana a la que aspira la sociedad democrática. Están obligados a cumplir con las obligaciones de la Rama Judicial

(Continúa . . .)

En la querella que nos ocupa, los Cánones específicamente imputados son el Canon I, preceptivo de que los jueces "deben velar porque sus actuaciones respondan a normas de conducta honren la integridad e independencia de su ministerio y estimulen el respeto y la confianza en la Judicatura"; el Canon III que establece que los deberes judiciales "tendrán prelación sobre cualquier otra actividad"; el Canon IV, que "exige de los jueces colaborar y ser cordiales con sus compañeros de trabajo"; el Canon V, mandatorio de que "los jueces deben cumplir con sus obligaciones administrativas"; el Canon VIII que proscribe que los jueces realicen actividades o aceptan cargos o encomiendas que generen notoriedad indeseable; el Canon IX que prescribe que los jueces se abstendrán de recomendar a abogados específicos para que tramiten causas o controversias judiciales; los Cánones XI y XII que disponen, respectivamente, que "los jueces deben ser imparciales y [deben] procurar excluir con su

_____

y respetar y honrar la función judicial. Además, al asumir el cargo aceptan también ciertas restricciones a su conducta, tanto en el ejercicio de sus funciones propiamente judiciales, como en sus demás actividades, ya sean personales o profesionales. Estas limitaciones, si bien no les privan de los derechos que poseen como miembros de nuestra sociedad, representan sacrificios en su vida pública y privada que enaltecen la integridad e independencia de su ministerio y estimulan el respeto y la confianza en la judicatura. Igualmente, se comprometen a fomentar un trato respetuoso y cordial hacia sus pares, las funcionarias y los funcionarios de la Rama Judicial y los que comparecen en sala.

comportamiento toda apariencia de conducta impropia" y que deben inhibirse de los procesos cuando, entre otras cosas, estén parcializados o tengan interés en el resultado del proceso"; y el Canon XV, que establece que "los jueces no deben tener comunicación con partes o abogados que pretendan influir en sus determinaciones".

De otra parte, también se le imputa a la Jueza Ramos Mercado la violación del Canon XXI que dispone que "los jueces no deben usar su poder o el prestigio de su cargo para promover el éxito de negocios privados o para su propio beneficio"; el Canon XXIII preceptivo de que "los jueces deben evitar toda conducta que pueda crear la apariencia de que pretenden influir en el ánimo de otro juez o Juez "; el Canon XXIV que establece que los jueces deben "ser escrupuloso[s] en evitar actuaciones que razonablemente puedan dar lugar a la impresión de que sus relaciones sociales, de negocios, de familia o de amistad influyen en […] sus determinaciones judiciales" y el Canon XXVI que establece que "los jueces deben observar fielmente el contenido de los cánones", y que expresa que éstos, como normas mínimas de conducta, "no excluyen otras normas que también obligan a los jueces". 4 L.P.R.A. Ap. IV – A. C. I, III, IV, V, VIII, IX, XI, XII, XV, XVI, XXI, XXIII, XXIV y XXVI.

Evaluemos los cargos a la luz de este marco ético normativo brevemente expuesto.

IV

**A. *Cargos relacionados con la intervención de la querellada con el trámite judicial y administrativo***

Discutiremos, inicial y conjuntamente, los cargos imputados contra la Jueza Ramos Mercado relacionados con su intervención en el trámite administrativo y judicial del caso del menor A.G. Son éstos los cargos 1, 3, 4(b), 5, 6, 10, 19 y 20, formulados en el primer informe de la OAT, los que en esencia plantean que la Jueza Ramos Mercado intervino impropiamente en dicho trámite usando las prerrogativas del cargo judicial para obtener beneficio personal, que intervino indebidamente en el caso de pensión alimenticia de la señora Clemente Cora, que presentó una moción de recusación que imputaba hechos que afectaban la reputación personal del juez cuya recusación procuraba, que incumplió con las directrices de órdenes administrativas y cartas circulares de la OAT, que tuvo acceso de modo irregular a los expedientes confidenciales del proceso judicial del menor A.G y que emitió un comunicado de prensa relacionado con el proceso judicial en el que figuraba como parte a pesar de que había una orden de confidencialidad emitida por la Juez que presidía el caso.

De entrada, debemos expresar que el deseo de la Jueza Ramos Mercado de relacionarse con el menor A.G. no constituye *per se* una conducta que pueda ser evaluada necesariamente bajo el crisol de los Cánones de Ética Judicial. Ese es un asunto sobre el que no nos compete

expresarnos. Nuestra intervención se limita a evaluar la eticidad de su conducta respecto a los trámites que siguió para intentar obtener la custodia del menor.

La prueba que tuvo ante sí la Comisión de Disciplina Judicial revela que Ramos Mercado se comunicó directamente con funcionarios de la División del Departamento de la Familia de la Región de Carolina, quienes por razón de sus responsabilidades profesionales ocasionalmente acudían a la sala de la juez como representantes de los intereses de partes interesadas, pues la Jueza Ramos Mercado estaba asignada a una sala de Relaciones de Familia. Ello explica por qué, a los ojos de algunos funcionarios del Departamento, fuera conveniente acceder a las solicitudes de Ramos Mercado para ganarse su favor en las causas judiciales que ella atendía y que el Departamento de la Familia era parte. Ramos Mercado, consciente de esa situación, debió ejercer la mayor prudencia posible para, al menos, evitar originar la apariencia de que pretendía utilizar el prestigio de su cargo para obtener ventaja. No lo hizo. Por el contrario, realizó llamadas continuas al personal del Departamento de la Familia asignado al caso, realizó en su oficina reuniones para discutir asuntos relacionados con los trámites judiciales y administrativos del proceso relacionado al menor A.G., insistió en que el Departamento de la Familia iniciara y aligerara el proceso de privación de la patria potestad de los padres del menor aún cuando conocía que la abuela de éste se encontraba en

el País, e intervino y pretendió que otros funcionarios gubernamentales intervinieran en los procesos administrativos en la Oficina Federal de Inmigración y Naturalización relacionados al estatus de inmigrante del menor A.G. Esas gestiones, revelan un claro menosprecio por los procesos administrativos regulares, que ella bien conocía, por la única razón de que tenía interés en el resultado de dichos procesos.

Pero, aún más. La Jueza Ramos Mercado no sólo menospreció los trámites regulares con el deliberado interés de lograr rápidamente la privación de la patria potestad de los padres biológicos sobre el menor, sino que en ese proceso se comportó con prepotencia, se identificó continuamente como la "Juez Ramos", insultó a funcionarios públicos cuando no actuaban conforme a sus deseos y generó un clima hostigante que motivó que algunos empleados del Departamento de la Familia pidieran ser relevados de sus responsabilidades.

Sabido es que el cargo de juez es visto con gran respeto por la ciudadanía. *In re: Comunicación del Hon. Juez Pérez Jiménez*, 112 D.P.R. 683, 685 (1982). Ese respeto puede ser fácilmente erosionado si los jueces comienzan a reclamar privilegios y a subvertir los procesos regulares para obtener ventajas indebidas. Por tal razón, hemos afirmado en el pasado que "[e]l prestigio del cargo de juez no es un activo que deba ser usado para gestionar privilegios o concesiones que de otro modo no

hubieran podido obtenerse. El prestigio del cargo, y la reputación bien ganada, sólo pueden ser carta de presentación en el ejercicio de las funciones judiciales". *In re: Almodóvar Marchany*, res. el 30 de marzo de 2006, 2006 TSPR 46.

Los hechos determinados probados por la Comisión de Disciplina Judicial revelan que la Jueza Ramos Mercado no hizo honor a este principio básico de prudencia y mesura en la realización de gestiones personales por parte de los jueces. Por el contrario, usó sus prerrogativas judiciales para tratar de beneficiarse e incluso lograr acceso al expediente del caso y examinar su contenido en dos ocasiones aún cuando conocía que tales expedientes eran confidenciales y el acceso a ellos estaba limitado, en cuanto a los funcionarios del Tribunal General de Justicia, a "previa muestra de necesidad y permiso expreso del tribunal". Véase, Regla 62.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Aun cuando Ramos Mercado, como Juez de Relaciones de Familia tenía autoridad para solicitar a la Secretaría del Tribunal expedientes de ese tipo de caso, debió prever que como parte con interés en el resultado de dicho caso era su deber abstenerse de realizar tales gestiones. Si aspiraba a convertirse en el hogar adoptivo del menor A.G., Ramos Mercado debió procurar que los procesos administrativos se realizaran de forma intachable y conforme con las normas administrativas regulares, de modo

que a los ojos de la ciudadanía no pareciera que obtenía beneficios indebidos. En cambio, como expresa el informe de la Comisión de Disciplina Judicial, Ramos Mercado:

"recibió en su hogar al menor A.G. sin que se hubiese realizado un estudio social de su hogar, viajó con el niño a Washington, DC en mayo de 2003 sin que su hogar hubiese sido certificado y licenciado como hogar de crianza por el Departamento de la Familia, lo matriculó en un campamento de verano sin antes solicitar la correspondiente autorización al Departamento, no entregó dentro del término provisto por el Reglamento para el Licenciamiento y Supervisión de Hogares de Crianza los documentos requeridos por la unidad de Cuidado Sustituto, cuestionó el plan de visitas establecido para la abuela a pesar [de] que conocía de las intenciones de la señora Romanota de que la custodia del menor A.G. le fuese entregada, requirió a la Lcda. Ojeda Rodríguez que presentara la solicitud de privación de patria potestad y que el proceso fuese aligerado y cuestionó cuando el Departamento de la Familia, dentro de sus facultades, determinó desistir de la solicitud de patria potestad". Informe de la Comisión, en la pág. 113 (notas al calce omitidas).

Además, fue igualmente impropio que la Jueza Ramos Mercado interviniera en la reactivación del caso de pensión alimenticia de la señora Clemente Cora. La intervención no es impropia por el único hecho de que el hogar de ésta era el hogar de crianza designado para el menor A.G., por lo que su intervención en dicho caso afectaba la imagen de imparcialidad de la judicatura, pues podría ser vista como una forma de congraciarse con ella, sino también por el hecho de que discutió asuntos de modo ex parte con la promovente. Nuestros Cánones claramente prohíben ese tipo de conducta. *In re: González Acevedo y Pagán Pagán, supra; In re: Yamil Suárez Marchán,* res. el

30 de junio de 2003, 2003 TSPR 115. El hecho de que la Jueza Ramos Mercado no dispusiera finalmente de los asuntos relacionados a dicho caso no atenúa la gravedad de su conducta.

Por otro lado, y contrario al criterio de la Comisión de Disciplina Judicial, consideramos que Ramos Mercado incurrió en una violación a los Cánones de Ética Judicial el autorizar la difusión de un comunicado de prensa mientras estaba vigente una orden judicial que impedía a las partes expresarse públicamente sobre el caso. Aun cuando el comunicado de prensa no contenía expresiones específicas sobre las incidencias procesales y que, entre otras cosas, reconocía que por razón de la misma orden estaba impedida de expresarse al respecto, la difusión del comunicado, sin previa autorización judicial, contenía una exposición pública sobre sus motivaciones e idoneidad para adquirir la custodia y patria potestad sobre el menor A.G. La orden judicial de confidencialidad se emitió en el contexto de un proceso judicial que había generado un significativo interés público. Ramos Mercado la desobedeció al expresamente hacer expresiones públicas relacionadas al pleito.

Conforme a la discusión precedente, y siguiendo el criterio de la Comisión de Disciplina Judicial, resolvemos que la Jueza Ramos Mercado violó los Cánones IV, XII, XXI, XXIV y XXVI a la luz de la conducta consignada en los cargos 1, 4(b), 5, 10, y 19.

De igual modo, coincidimos con la Comisión de Disciplina Judicial en que la Jueza Ramos Mercado no incurrió en violación a los Cánones de Ética al presentar una moción de recusación contra el Juez Rafael Vissepó. Hemos examinado la moción de recusación contra el Juez Vissepó. De su faz no surge que haya incluido información difamatoria u ofensiva, más allá de cuestionar la capacidad de éste para actuar imparcialmente ya que, siendo su supervisora tuvieran algunas diferencias de criterios.

Por último, debemos expresarnos respecto a la alegada conducta éticamente impropia relacionada con la Regla 16 de las de Administración del Tribunal de Primera Instancia. La referida Regla dispone en lo pertinente:

> Cuando cualquier empleado o empleada, funcionario o funcionaria, juez o Juez de una región judicial sea parte en litigios que se hayan presentado o que vayan a presentarse en la sala en que laboran, el Juez Administrador o la Juez Administradora de la Región Judicial correspondiente, de concluir que es necesario para proteger la imagen de imparcialidad del sistema, trasladará el caso a otra sala o coordinará su traslado a la región judicial geográficamente más cercana con el Juez Administrador o la Juez Administradora correspondiente. […]. 4 L.P.R.A. Ap. II-B R. 16.

En el pasado hemos expresado que aun cuando esta Regla impone obligaciones directamente a los Jueces Administradores, los demás jueces de las Regiones Judiciales no deben soslayar su contenido y los propósitos que la inspiran. *In re: González Acevedo y Pagán Pagán, supra*. Respecto a los hechos específicos que tenemos ante

nuestra consideración, notamos que la Jueza Ramos Mercado tenía un claro e indisputable interés en el resultado del caso *Departamento de la Familia v. Irina Smith*, *supra,* ya que mientras el caso estaba asignado a la Región Judicial de Carolina mantenía relaciones con el menor cuya custodia y patria potestad era objeto de controversia. Ante esa circunstancia no podía soslayar su deber ético de evitar crear incluso la mera apariencia de que adelantaba sus intereses personales respecto al resultado del caso y debió estar consciente, en todo momento, de los riesgos que creaba sus vínculos con el menor durante el tiempo que el caso estuvo en la Región Judicial de Carolina.

Por otro lado, consideramos que Ramos Mercado actuó indebidamente al solicitar a varias abogadas del Departamento de la Familia que continuaran interviniendo en el caso *Departamento de la Familia v. Irina Smith*, *supra.* Sin embargo, esa conducta impropia no se deriva del Canon IX de los de Ética Judicial, que específicamente prohíbe a los jueces recomendar abogados a personas o a partes. Se deriva más bien de los deberes que imponen los Cánones de no pretender influir, o en modo alguno intervenir, en los procesos investigativos o administrativos de las entidades públicas y privadas. Por ello, luego de evaluar su conducta a la luz de los Cánones que regulan tal comportamiento, concluimos que las gestiones al respecto de Ramos Mercado igualmente fueron impropias.

**B.** *Cargos relacionados con la alegada comisión de varios delitos*

Varios de los cargos imputados a la Jueza Ramos Mercado plantean que incurrió en varios delitos y que por tal razón debe ser disciplinada. En particular, se alega que cometió el delito de alteración a la paz, Art. 153 del Código Penal de Puerto Rico de 1974, 33 L.P.R.A. 4194, cuando se comunicó telefónicamente con la señora Anastacia Kitsul la noche del 20 de noviembre de 2003 (Cargos 11 y 12) y cuando amenazó al intérprete Alexander Savvinov la noche del 9 de diciembre luego de una reunión familiar (Cargo 13); que durante el proceso de remoción del menor A.G. de su hogar cometió el delito de agresión agravada, Art. 95(1)(a) del Código Penal de Puerto Rico de 1974, 33 L.P.R.A. 4032, (Cargos 14, 15 y 16); que incurrió en el delito de privación ilegal de custodia (Cargo 17) Art. 161 del Código Penal de 1974, 33 L.P.R.A. 4244, al impedir que funcionarios del Departamento de la Familia, entidad que tenía la custodia legal del menor, removieron al niño de su hogar; y que mientras se relacionó con el niño incurrió en el delito de maltrato, según tipificado por la Ley para el Bienestar y la Protección Integral de la Niñez, Art. 75, Ley Núm. 177 de 1 de agosto de 2003, 8 L.P.R.A. secs. 444 *et seq*. (Cargo 18). De este modo, conforme están redactados los cargos, parecería que la configuración de la violación ética alegada implicaría determinar la comisión de algún delito.

De entrada, debemos aclarar que aun cuando un deber consustancial al cargo de juez es cumplir con la ley, la Comisión de Disciplina Judicial no tiene facultad para determinar si una persona querellada ha cometido un delito. Su rol se limita a evaluar la prueba que se le somete para determinar si ha habido una violación a los Cánones de Ética Judicial conforme al estándar probatorio requerido, que, como se sabe, es prueba clara, robusta y convincente. Regla 25 de las Reglas de Disciplina Judicial, res. el 8 de marzo de 2005, 2005 TSPR 30; *In re: Ruiz Rivera,* res. el 28 de junio de 2006, 2006 TSPR 106; *In re: Caratini Alvarado*, 153 D.P.R. 575 (2001).

De este modo, ante conducta que también pudiera constituir delito bajo las leyes penales de nuestro ordenamiento, la Comisión únicamente puede determinar si, bajo el criterio probatorio aplicable a sus funciones, un juez ha incurrido en conducta proscrita por los Cánones. Sin embargo, por el diverso alcance del peso probatorio requerido, esa determinación no constituye una adjudicación de la posible responsabilidad penal de un querellado. Claro está, si un tribunal oportunamente determina que un juez ha incurrido en la comisión de un delito, esto posiblemente bastaría para también concluir que ha incurrido en una violación a los Cánones de Ética Judicial. Por el contrario, una absolución de la responsabilidad penal no conlleva necesariamente una absolución de la responsabilidad disciplinaria. De este

modo, debemos evaluar si el comportamiento de la Juez configuró una violación ética independientemente de que también pudiera constituir conducta delictiva.

La Comisión de Disciplina Judicial concluyó que la prueba aportada no revelaba que la conducta alegada constituyera una violación de los Cánones de Ética Judicial. Discrepamos.

Aun cuando los hechos narrados revelan una atmósfera de mucha tensión entre los involucrados y se apartan de las mejores prácticas de civilidad, nos parece que la Jueza Ramos Mercado, conociendo que la custodia legal sobre el menor A.G. la ostentaba legítimamente el Departamento de la Familia, no podía oponerse a que dicha agencia lo removiera de su hogar; como anteriormente expresamos, en un principio optó por no entregar la custodia del niño cuando le fue requerido. Dicha conducta revela un claro menosprecio a la autoridad del Departamento de la Familia y a las leyes del País que regulan el asunto. No podemos avalar esa conducta. Los Cánones de Ética Judicial, como normas mínimas de comportamiento ejemplar, incorporan los más elementales principios de civilidad y de respeto a la autoridad gubernamental que legítimamente cumple sus funciones.

**C. Cargos relacionados con el manejo del caso Ex parte Lizbeth Carrión Sotomayor, supra.**

La OAT le imputó a Ramos Mercado incurrir en violaciones éticas por actuar con parcialidad en la

tramitación del caso *Ex parte Lizbeth Carrión Sotomayor, supra*, y haber continuado interviniendo en éste aun después de contratar como su representante legal a una de las abogadas de las partes de dicho caso. De este modo, se aduce que violó las disposiciones éticas que le imponen el deber de inhibirse de un proceso judicial cuando tenga algún vínculo profesional con alguno de los abogados de las partes. Los cargos que imputan estos hechos son los cargos 6 al 12 del segundo informe de investigación de la OAT.

La prueba reveló que la Jueza Ramos Mercado tramitó con mucha liberalidad la consideración de la controversia que restaba por adjudicar en el proceso de división de la sociedad de gananciales en el caso *Ex parte Lizbeth Carrión Sotomayor, supra*. Llegó incluso a conceder prórrogas a una de las partes sin que ésta lo solicitara. Tal proceder, en ausencia de otras circunstancias que revelen parcialidad podría, al menos, parecer un manejo deficiente e inefectivo del caso, lo que es *per se* una violación al deber de diligencia en la tramitación de las causas que establecen los Cánones de Ética Judicial. Canon 17 de los de Ética Judicial de 2005, 4 L.P.R.A. Ap. IV-B C. 17 (Supl. 2006). Sin embargo, cuando el juez que preside el proceso contrata como su representante legal para el manejo de un asunto personal al abogado de la parte a la que usualmente favorecen estas determinaciones liberales, surge al menos una fundada sospecha de

actuación parcializada. Esta fue la situación en el presente caso.

El contrato de servicios profesionales entre Ramos Mercado y la Lcda. López Prieto se formalizó el 8 de diciembre de 2003, pero fue retroactivo al 21 de noviembre de 2003, fecha en que ésta participó en una reunión celebrada en el Departamento de Estado en representación de aquélla. La prueba demostró, sin embargo, que días antes de dicha reunión, López Prieto realizó gestiones telefónicamente a favor de Ramos Mercado y de su esposo en relación con el caso del menor A.G. *Informe de la Comisión*, en la pág. 125.

De forma simultánea con estas gestiones, Ramos Mercado tenía ante su consideración el caso *Ex parte, Lizbeth Carrión Sotomayor*, *supra*, en el que la Lcda. López Prieto representaba a la parte promovida. También tenía ante su consideración otros casos en que López Prieto era abogada de una de las partes.[13]

A pesar de la relación abogado cliente que se estableció entre López Prieto y Ramos Mercado, ésta no se

---

[13] El Informe de la Comisión de Disciplina Judicial destaca que durante los años 1997 a 2003 la Jueza Ramos Mercado intervino en varios casos en que la Lcda. López Prieto figuraba como representante legal de una de las partes. Indica el informe que "[e]ntre los casos ante la consideración de la Juez Ramos Mercado se encontraba *Emmanuel Burgos Miranda v. Sheila Ann Villabol Román*, FAL 1997-9866, donde la Lcda. López Prieto representaba a la parte demandante. Mediante Resolución de 22 de diciembre de 2003 la Juez Ramos Mercado se inhibió de participar en el caso al amparo de la Regla 63.1 de las Reglas de Procedimiento Civil y el Canon XII de Ética Judicial". *Informe de la Comisión*, en la pág. 94.

inhibió. Por el contrario, el 11 de diciembre de 2003 emitió una orden interna en la que refirió el asunto a la Juez Vicenty Nazario. Ante este cuadro de hechos, nos vemos compelidos a concluir que Ramos Mercado incurrió en las violaciones ética que se le imputaron.

En el pasado hemos destacado la importancia de la imparcialidad y de la apariencia de imparcialidad en el ejercicio de las funciones judiciales. *In re: Campoamor Redín*, 150 D.P.R. 138 (2000). Hemos destacado su importancia para la legitimidad y confianza de la ciudadanía en la Judicatura. La inhibición oportuna, es una herramienta que permite proteger dicho interés en situaciones apropiadas. Canon 20 de los de Ética Judicial del 2005, 4 L.P.R.A. Ap. IV-B, C. 20. Ramos Mercado actuó a destiempo. Forzoso es concluir que por tal razón, violó los Cánones de Ética Judicial que debía cumplir. En específico, por la conducta descrita en los cargos 6 al 12, Ramos Mercado violó los Cánones I, XI, XII, XV, XXI, XXII y XXVI de Ética Judicial.

Un último aspecto debe destacarse. La conducta de la Lcda. López Prieto no parece estar exenta de responsabilidad disciplinaria al amparo de los Cánones de Ética Profesional. Aun cuando los deberes impuestos por los Cánones de Ética Judicial recaen exclusivamente sobre los jueces, por exigencia de los Cánones de Ética Profesional, los abogados deben también evitar ser partícipes de actuaciones que puedan mancillar la imagen

de imparcialidad de la Judicatura. Por tal razón, y atendiendo una referencia expresa al respecto de la Comisión de Disciplina Judicial[14], procede instruir al Procurador General a que realice una investigación sobre la conducta profesional de la Lcda. Ana López Prieto y nos rinda un informe al respecto; ello con el fin de que, en su momento, podamos adjudicar la responsabilidad disciplinaria que proceda.

**D.  Cargos relacionados con el manejo del caso *Ex parte Madeline González Urbina, supra*.**

Con relación al caso *Ex parte, Madeline González Urbina, supra*, se imputa a la Jueza Ramos Mercado actuar de forma impropia al intervenir e intentar favorecer a su alguacil de sala en el proceso de corrección de su certificado de nacimiento. Conforme a los hechos determinados probados, cuando el Juez Vissepó, a quien estaba asignado el caso, se enteró de que la Juez Vicenty Nazario había emitido y notificado una sentencia luego de que el expediente del caso le fue referido por un error en el epígrafe, la Jueza Ramos Mercado solicitó el envío del expediente para notificar la sentencia correctamente. La prueba demostró que la conversación entre Ramos Mercado y Vissepó culminó abruptamente por la diferencias de criterios en el manejo del caso.

---

[14] Expresa la Comisión de Disciplina Judicial en su informe que "[l]a Comisión llama la atención al Tribunal Supremo sobre las actuaciones reflejadas en este caso por la Lcda. Ana López Prieto a la luz de los Cánones de Ética Judicial". *Id.* en la pág. 131.

Aun cuando tal incidente revela un carácter poco prudente de la Jueza Ramos Mercado, consideramos que la prueba aportada sólo revela un incidente lamentable y desagradable entre dos jueces. Por tal razón, resolvemos que el incidente, aun cuando origina algunas interrogantes sobre las verdaderas motivaciones de la Jueza Ramos Mercado, no configuran las violaciones éticas imputadas en los cargos 1, 2, 3, 4, 5 y 13 del segundo informe de investigación presentado por la OAT.

V

En resumen, de conformidad con la discusión precedente, resolvemos que la Jueza Ramos Mercado violó los Cánones I, XI, XII, XV, XXI, XXII, XXIII y XXVI. Esto es, utilizó el prestigio y autoridad del cargo para lograr beneficio personal en el manejo del caso *Departamento de la Familia v. Irina Smith, supra*; logró acceso a información confidencial sin seguir los procesos reglamentarios establecidos; realizó gestiones continuas en el Departamento de la Familia y con sus funcionarios para influir en sus procedimientos; intervino como juez en un caso en el que había orientado a la parte promovente con quien, además, mantenía relaciones frecuentes pues era la dueña del hogar custodio del menor A.G.; emitió un comunicado de prensa en contravención a una orden judicial de confidencialidad; impidió que el Departamento de la Familia removiera al menor A.G. de su hogar conforme la

autoridad legal que tenía para hacerlo; y contrató como su representante legal a una abogada que litigaba en su sala.

Estas actuaciones, no hay duda, afectan a todos los que integran la Rama Judicial. No podemos ser tolerantes o condescendientes ante tal comportamiento. Por tal razón, resolvemos que, como sanción, procede decretar la destitución inmediata de la Lcda. Maritza Ramos Mercado del cargo de Juez Superior. La temeridad y gravedad de la conducta por ella incurrida no nos dejan otra opción.

Por último, instruimos a la Secretaría de este Tribunal a que remita copia de esta determinación al Procurador General de Puerto Rico para que realice una investigación sobre la conducta profesional de la Lcda. Ana López Prieto con el fin de que en su momento podamos determinar la responsabilidad disciplinaria que proceda.

Se emitirá la correspondiente Sentencia.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


*In re*

Maritza Ramos Mercado                    AD-2004-3(A)

                                         AD-2004-5


SENTENCIA

San Juan, Puerto Rico, a 27 de febrero de 2007

    Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia decretando la destitución inmediata de la Lcda. Maritza Ramos Mercado del cargo de Juez Superior.

    Se instruye a la Secretaria de este Tribunal para que remita copia de esta determinación al Procurador General de Puerto Rico para que realice una investigación sobre la conducta profesional de la Lcda. Ana López Prieto con el fin de que en su momento podamos determinar la responsabilidad disciplinaria que proceda.

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez inhibida. Los Señores y Señoras Jueces que intervienen lo hacen por Regla de Necesidad.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. Maritza Ramos Mercado          AD-2004-3(A)    Conducta
Jueza Superior                                       Profesional
Tribunal de Primera Instancia       AD-2004-5

Opinión de Conformidad emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico a 27 de febrero de 2007.

Estamos conformes con la Opinión *Per Curiam* que hoy emite este Tribunal en la cual se impone la más severa de las sanciones a uno de los miembros de esta Rama que lesionó los postulados éticos, más básicos, que un día juró defender. Los hechos determinados probados por la Comisión de Disciplina Judicial no permiten otra conclusión que no sea que la Jueza Maritza Ramos Mercado abusó de las prerrogativas del cargo judicial para obtener beneficio personal en los procesos administrativos y judiciales relacionados con el menor A.G. y que procede su destitución inmediata.

Sus actuaciones estuvieron motivadas por el interés de lograr la custodia y eventual adopción

del menor con claro menosprecio hacia los procesos judiciales y administrativos que se tramitaban al respecto. La conducta de la Jueza Ramos Mercado, tanto en el ámbito judicial como en el extrajudicial, rebasó la línea que distingue la conducta prudente de las actuaciones indebidas y contrarias a la ética judicial.

No obstante, al adjudicar este caso lo hacemos conscientes de que la conducta de la Jueza Ramos Mercado no es representativa de la labor de los trescientos ochenta y cuatro jueces y juezas que forman parte de nuestra Rama. Nuestro país puede tener plena confianza de que su judicatura está compuesta por una plantilla de jueces y juezas que cumplen cabalmente con los Cánones de Ética Judicial y que se esfuerzan por impartir justicia conforme al derecho aplicable con imparcialidad, integridad y valentía.

I

Conforme a nuestro ordenamiento jurídico, los jueces y juezas que son objeto de señalamientos de violaciones a la ley, o a los Cánones de Ética Judicial, deben ser sometidos a un procedimiento investigativo y adjudicativo, donde se le garantice, a su vez, un debido procedimiento de ley. Así surge de las Reglas de Disciplina Judicial, adoptadas por este Tribunal, las cuales rigen los procesos disciplinarios contra los jueces.

El proceso disciplinario contra un juez lo puede iniciar cualquier persona interesada en que se investigue su conducta mediante la presentación de una queja

juramentada ante la Oficina de Asuntos Legales de la Oficina de Administración de los Tribunales. Regla 5 de las Reglas de Disciplina Judicial, 4 L.P.R.A. Ap. XV-B R. 5.

Si de la investigación realizada se desprende que la conducta investigada amerita acción disciplinaria contra el juez o la jueza, la Directora de la Oficina de Administración de Tribunales lo remite a la Comisión de Disciplina Judicial (en adelante, la Comisión) para que ésta determine si existe o no causa probable para dar curso al procedimiento disciplinario. La Comisión fue nombrada por el Tribunal Supremo de conformidad con la autoridad concedida por el Art. V, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico y por la Ley de la Judicatura de 2003, Ley Núm. 201 de 22 de agosto de 2003, 4 L.P.R.A. Sec. 24 *et seq.*[15]

Recibido el Informe en la Comisión, uno de los Comisionados Asociados pasa juicio sobre su contenido y determina mediante resolución si existe o no causa probable para continuar el procedimiento disciplinario. De determinar causa probable, ordena a la Oficina de Asuntos Legales presentar la querella correspondiente. 4 L.P.R.A. Ap. XV-B R.14.

Iniciada esta etapa disciplinaria, el juez o la jueza tiene derecho a descubrir la prueba en su contra y a que se

---

[15] La Comisión rinde un valioso servicio a la Rama Judicial y actualmente está compuesta por su Presidenta, la ex-jueza Aida M. Molinary de la Cruz y cinco comisionados asociados y comisionadas asociadas. Estos son los ex-jueces Flavio E. Cumpiano Villamor, Delia Lugo Bougal y Ángel F. Rossy García; el Prof. Carlos E. Ramos González y la Sra. Idalia M. Franco Cantino.

celebre posteriormente una vista evidenciaria para que la Comisión reciba la prueba correspondiente. 4 L.P.R.A. Ap. XV-B R.18 y 21. Durante dicha vista, el querellado tiene derecho a confrontar los testigos de cargo; a examinar la prueba documental o demostrativa presentada, y a presentar evidencia a su favor. 4 L.P.R.A. Ap. XV-B R.23. Además, todos los cargos en contra del juez deben ser probados mediante prueba clara, robusta y convincente. *In re Ruiz Rivera*, res. el 28 de junio de 2006, 2006 TSPR 106; *Id.*, Regla 25.

Tras la celebración de la referida vista, la Comisión prepara un informe con sus determinaciones de hechos y conclusiones de derecho. Además, dicho informe contiene una recomendación al Tribunal Supremo sobre la medida disciplinaria que debe ser impuesta al juez o jueza. El informe es notificado oportunamente a las partes y éstas tienen derecho a solicitar reconsideración. Culminado el periodo de reconsideración, la Comisión presenta el aludido informe a la consideración del Tribunal Supremo. 4 L.P.R.A. Ap. XV-B R.28.

Como se puede colegir de este ordenamiento procesal, la delicada labor de dirimir una queja contra un juez conlleva un procedimiento que garantiza que cualquier acción disciplinaria cumpla con el debido proceso de ley. De esta forma, se evita tomar decisiones con celeridad inusitada. A la misma vez, se logra un proceso que le garantiza al país que los jueces observarán una conducta

digna de su confianza y de las responsabilidades depositadas en ellos.

**De lo anterior se desprende claramente que nuestro sistema de justicia provee los mecanismos necesarios para investigar y sancionar conducta impropia de los jueces cuando se violan los Cánones de Ética Judicial, particularmente cuando la misma socava la confianza que el pueblo tiene en nuestra judicatura**.

## II

En lo que respecta a la querella presentada en el caso de autos, no albergamos duda de que la Jueza Ramos Mercado fue sometida a un riguroso procedimiento investigativo y adjudicativo, en el cual la Comisión de Disciplina Judicial de este Tribunal dilucidó cuidadosamente toda la prueba presentada en su contra mediante un procedimiento en el cual se le garantizó su derecho a un debido proceso de ley. Así se desprende claramente de un minucioso análisis del expediente que obra en nuestro poder.

Dicho expediente refleja, tal y como se recoge en la relación de hechos de la Opinión de este Tribunal, que el 19 de febrero de 2004, la entonces Jueza Presidenta de este Tribunal, Hon. Miriam Naveira Merly, ordenó a la Oficina de Administración de los Tribunales que realizaran una investigación administrativa sobre la conducta desplegada por la Jueza Ramos Mercado en el manejo de los casos *Departamento de la Familia v. Irina Smith*, NSRF 2003-0966 y *Ex Parte José Rodríguez Quiñones y Maritza Ramos Mercado,* NSRF 2004-0163. Oportunamente, la investigadora especial

nombrada por la Oficina de Administración de los Tribunales rindió su informe. Examinado dicho informe y ante la gravedad de los hallazgos, la entonces Jueza Presidenta Naveira Merly relevó inmediatamente de sus funciones judiciales a la Jueza Ramos Mercado y sometió el Informe a la Comisión de Disciplina Judicial.[16]

Según lo dispuesto en el reglamento, uno de los Comisionados determinó que existía causa probable para creer que la Jueza Ramos Mercado violó los cánones I, III, IV, V, VIII y IX, XI, XII, XV, XVI, XXI, XXIII, XXIV y XXVI de los de Ética Judicial de 1977 y la Regla 16 del Tribunal de Primera Instancia. Celebradas vistas orales por varios días, y luego de un detallado análisis de las circunstancias del caso y de toda la evidencia testifical y documental sometida por las partes, la Comisión de Disciplina Judicial rindió un **extenso y bien fundamentado informe** a este Tribunal en el cual, <u>**por unanimidad**</u> recomienda *"la destitución del cargo de Jueza Superior de la aquí querellada"*. Dicha recomendación fue acogida de forma unánime por los jueces que hemos participado en este caso.

Ciertamente, tal y como se señala en la Opinión unánime de este Tribunal, *"[e]stas actuaciones, no hay duda, afectan a todos los que integran la Rama Judicial. No*

---

[16] El 14 de julio de 2004, la Oficina de Administración de los Tribunales presentó a la Comisión un segundo informe de investigación respecto a la conducta desplegada por Ramos Mercado en el manejo de los casos *Ex Parte Madeline González Urbina*, FJV 2003-1156 y *Ex Parte Lizbeth Carrión Sotomayor y Javier A. Sánchez López*, FDI 2002-1543.

*podemos ser tolerantes o condescendientes ante tal comportamiento*".

En una sociedad democrática, los jueces y juezas, al igual que todo ciudadano o ciudadana, "están obligados a cumplir con la ley, modelando la conducta ciudadana a la que aspira la sociedad democrática". Cánones de Ética Judicial, Preámbulo, 4 L.P.R.A. AP. IV-B. Pero la responsabilidad del juez o la jueza trasciende aún más, toda vez que, "en nuestra sociedad[,] el cargo de juez es un cargo especial que proyecta una visión y noción pública destacada, de prestigio e influencia". *In re Almodóvar Marchany*, res. el 30 de marzo de 2006, 2006 TSPR 46.

En el pasado, hemos señalado enfáticamente que:

> Los jueces, por su investidura, no están al margen de la ley ni se colocan en un sitial privilegiado para tramitar causas personales ante los tribunales. Desde el estrado, como fuera de él, deben ser fieles cumplidores de la ley y de las normas que rigen los procedimientos judiciales. *In re González Acevedo*, res. el 20 de junio de 2005, 2005 TSPR 87.

Cuando un juez usa el prestigio y las prerrogativas del cargo para su beneficio personal se lacera la confianza ciudadana en todos los jueces. Se ciñe sobre éstos una mirada de desconfianza que erosiona la legitimidad del sistema de administración de la justicia. Tal peligro no puede movernos a otra cosa que no sea adoptar una actitud de **cero tolerancia** a actuaciones que revelen conducta contraria a la imparcialidad, integridad e independencia que debe caracterizar a los jueces.

Así como en el pasado hemos sido enfáticos al afirmar que la investidura judicial obliga al juez a despojarse de todo vínculo que pudiera arrojar dudas sobre su capacidad para resolver controversias de modo imparcial, sean de índole político, familiar o de otro género, también hemos insistido que en el manejo de sus asuntos personales, los jueces están obligados a circunscribirse a los mandatos de la ley y a los Cánones de Ética Judicial. Véase, *In re: Scherrer Caillet-Bois*, res. 21 de septiembre de 2004, 2004 T.S.P.R. 151; 162 D.P.R. ___ (2004).

**En el pasado hemos defendido a los jueces con vehemencia cuando sobre ellos se ha centrado la crítica injusta o infundada. Con igual vehemencia censuraremos a quienes se apartan de los principios éticos que regulan la conducta judicial. Por tal razón, en situaciones como la del presente caso, en las que un juez se aprovecha de su cargo para obtener beneficio personal, y así se demuestra tras el correspondiente proceso probatorio, no podemos sino imponer la más enérgica sanción.**

Por ende, estamos totalmente de acuerdo con la decisión tomada por este Tribunal de decretar la destitución inmediata de la Lic. Maritza Ramos Mercado de su posición como Juez Superior. Su conducta violó la confianza depositada en ella por el Pueblo de Puerto Rico cuando juramentó su cargo. Ella deshonró la integridad e independencia de su ministerio y usó el poder y prestigio

de su cargo para su propio beneficio. Su conducta no puede ser tolerada por este Tribunal, y procede su destitución.

Federico Hernández Denton<br>
Juez Presidente